UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No. 5:23-cv-440

| | |
|---|---|
| MXR IMAGING, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> EVOHEALTH LLC and STEVEN DEATON, *individually and in his capacity as Chief Executive Officer and Owner of EvoHealth LLC*, <br><br> *Defendants*. | **COMPLAINT** <br><br> Jury Trial Demanded |

Plaintiff MXR Imaging, Inc. ("Plaintiff" or "MXR"), by its undersigned attorneys, complains against Defendants EvoHealth LLC ("EvoHealth") and Steven Deaton ("Deaton") as follows:

## NATURE OF THE ACTION

1. Plaintiff entered into what it hoped would be a mutually beneficial business relationship with Defendants EvoHealth and Deaton, with Defendants engaged to provide Picture Archival and Communication Systems (hereinafter "PACS") software to Plaintiff's customers.[1]

2. Defendant EvoHealth, however, failed to perform in accordance with purchase orders, which forced Plaintiff to provide its customers with alternate PACS software and services at Plaintiff's own cost and expense. These significant expenses do not account for future interest or future liabilities under the business that Plaintiff has lost from customers due to Defendants' conduct, and thus Plaintiff's damages will increase.

---

[1] Defined below.

3. Defendant Deaton engaged in a scheme of accepting monies at EvoHealth on the front end of multi-year contracts for PACS software and related services with Plaintiff's customers, all while having no intention of actually supporting the PACS software for more than a couple months, and then pocketing the proceeds. Due to Defendant Deaton's intentional misrepresentations and/or failures to perform, and his subsequent failures to rectify breaches, Plaintiff has incurred significant expenses that are continuing and ongoing.

4. In addition, Plaintiff's reputation has suffered in the medical diagnostic equipment industry due to its customers purchasing EvoHealth PACS systems and the associated services that were in some cases never provided or maintained as promised. As such, Plaintiff has been significantly impacted by the actions of Defendants EvoHealth and Deaton, and seeks recovery of adequate reimbursement and other damages.

**THE PARTIES**

5. MXR is in the business of medical imaging technology. It is believed to be one of the largest independent medical imaging services organizations in the United States.

6. MXR is a California corporation with its principal place of business in San Diego, California.

7. Defendant EvoHealth is a limited liability company organized under the laws of Delaware. Its principal place of business is located in Raleigh, North Carolina.

8. Defendant Deaton is or was the Chief Executive Officer of EvoHealth and, upon information and belief, its sole member. Deaton resides in Raleigh and is a citizen of North Carolina.

**JURISDICTION AND VENUE**

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1332(a). Complete diversity of citizenship exists between MXR and Defendants, and the matter in controversy exceeds the sum or value of $75,000, as the wrongful actions of Defendants have damaged MXR in an amount in excess of this sum.

10. The Court has personal jurisdiction over Defendant Deaton, as he is (and was at all relevant times of the allegations in this Complaint) a resident of North Carolina, and performed his wrongful conduct in North Carolina.

11. The Court has personal jurisdiction over Defendant EvoHealth, as its principal place of business is located in North Carolina, it conducts business in North Carolina including for North Carolina-based customers, and it performed its wrongful conduct in North Carolina.

12. Venue is proper in this district and division pursuant to 28 U.S.C. § 1391(b)(2), as a substantial portion of the acts, omissions, and transactions giving rise to MXR's injury occurred in this district and division, where Defendants failed to uphold their end of a deal and engaged in conduct that damaged Plaintiff.

## FACTUAL BACKGROUND

### MXR's business and PACS software

13. Plaintiff MXR was founded in 1956 and has grown to become one of the nation's largest independent providers of sales, service, training, parts, and supplies for diagnostic imaging equipment. The MXR product portfolio includes new, used, and reconditioned equipment for x-ray, ultrasound, computerized tomography (i.e., CT scan), Magnetic Resonance (i.e., MRIs), Digital Radiography ("DR"), and Computed Radiography ("CR") probes. MXR has locations and employees strategically located throughout the United States to provide sales and service support to its customers.

14. Part of MXR's business is providing support to healthcare organizations of all sizes

related to their use of medical imaging technology. This includes Picture Archiving and Communication Systems ("PACS"), a type of software that stores and transmits patient information captured by medical imaging and allows such information to be accessed by healthcare professionals across an institution (or multiple institutions). A PACS system is a more efficient, cost-effective, and safe alternative to physical files.

15. Typically, a PACS system operates by storing information in the cloud, i.e., on a remote computer server not located onsite at a healthcare organization.[2] Once a healthcare professional uploads medical imaging files to the system, it may be accessed remotely by others with the proper login credentials (such as specialists, family doctors, and urgent care workers).

16. An example helps explain how this system works in practice: A technician takes scans of a patient's arm using an x-ray machine, which uploads the x-ray images to the PACS system used by the hospital. A radiologist located in another building logs into the PACS system on a computer, locates the patient's information, and views the x-rays in order to diagnose a bone fracture.

17. Because medical imaging files are uploaded to and later accessed from remote computer servers, a PACS software provider must ensure that the servers are maintained. If the servers shut down or otherwise fail, then the customer will be unable to access patient information that was uploaded using PACS software.

18. PACS software is highly configurable and can be modified to better suit a particular customer's needs. For example, in addition to patient records containing medical imaging, some

---

[2] *See* "Cloud Computing," *Black's Law Dictionary* (11th ed. 2019) ("The practice of sharing computing resources via the Internet; esp., the practice of accessing, sharing computing resources via the Internet; esp., the practice of accessing, manipulating, processing, and storing data on a remote server. Cloud computing is an elastic, measured service offering on-demand, self-service access to computational resource pooling through Internet-capable devices.").

PACS software also stores and transmits information regarding patient scheduling, billing, and consultation.

19. MXR enters the picture by matching up its healthcare organization customers with a PACS system that supports their needs. MXR uses its knowledge of a customer's medical practice on the one hand, and its knowledge of and experience with various service providers in the PACS marketplace on the other, to recommend an effective, reliable, and affordable solution.

20. The process of vetting PACS software providers is critical. As medical providers in possession of the confidential healthcare records of their patients, MXR's customers must maintain compliance with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Any PACS software used by them must also be HIPAA compliant.

21. MXR would then work with a PACS provider to offer guidance on developing the particular iteration of PACS software to be used by the MXR customer, including which features to include, how much data storage is needed, and what specific medical imaging equipment would need to have the PACS installed on it. Oftentimes, MXR will sell the customer such equipment with the PACS software already installed and ready to use.

**MXR begins working with EvoHealth to provide its customers with PACS software solutions**

22. Defendant EvoHealth is a PACS software provider.

23. In January 2022, Defendant Deaton, on behalf of EvoHealth, began accepting purchase orders from MXR where EvoHealth would act as a contract manufacturer of PACS software and related services for MXR's customers.

24. Defendant EvoHealth agreed to develop and install PACS software and maintain servers and/or databases ("related services") to the following customers of MXR: Acute Care Surgery of Texas, Altoona Lung Specialists, Boyette Ortho, Brahams Cohn & Leb, DRS, Cape

Fear, Carolina Donor Services, Central North Alabama Health Services, Cleveland Cliffs Burns Harbor, LLC, CNY Family Care, Coastal Orthopedics & Sports Med, College of Healthcare Professions, Cornerstone Regional Hospital, Crimson Urgent Care, Daytona Heart Group, Family Health Centers, Inc., FASTMED Clinics Urgent Care, First Choice Community Health Center, First Physicians, First Response Urgent Care, Florida State Hospital, Gutierrez MD, Marco & Associates, Hagerstown Correctional Facility, Kidney Hypertension & Transplant Spec., Kids Choice Pediatric Orthopedic, Leighton Orthopedic, Little Alsace Urgent Care, Mandy's Primary Healthcare, Meridian Medical Services FNC, Monticello Medical, Morrilton Medical, Norton Family Practice, Olsen Orthopedics, Orthopedic Specialty Clinic, Providence Imaging Center, Inc., Pulmonary & Critical Care Cons, Southwest Orthopedic Clinic, Springfield Family Physicians LLP, Surgery Center of Fairbanks, Terry Reily Health, Texas Tech. Athletics, TRI-County Orthopedic Group PC, and Wilson Community Health Center (hereinafter collectively referred to as the "customers").

25. MXR has cultivated business relationships with its customers for over fifty years and holds these relationships in the highest regard.

26. MXR was the source of bringing its customers directly to EvoHealth. The customer would sign MXR's contract and MXR would issue a purchase order to EvoHealth for bringing EvoHealth the customer. In some circumstances, MXR's customer would sign EvoHealth's contract.

27. At the inception of the MXR and EvoHealth business relationship, Defendant Deaton attended MXR's 2019 Regional Meeting and provided MXR's Sales Team a Power Point stating that EvoHealth provides a "stable product" and "experience with how to support you and your clients."

28. After attending MXR's Regional Meeting in 2019, Defendant Deaton began serving as a paid sponsor to MXR's National Sales Meetings; however, in 2023 he did not pay for the sponsorship and reaped the benefits of free marketing and dedicated meeting time with the entire MXR Sales Team.

29. At MXR's 2023 National Sales Meeting, Defendant Deaton continued to make promises to MXR executives and sales personnel knowing that he would not be able to fulfill those promises.

30. As part of this business relationship, EvoHealth would develop, install, and implement PACS software for each of MXR's customers, and then provide continued maintenance and support for these systems for many years to come; most were sixty (60) month service contracts.

**EvoHealth and Deaton immediately fail to deliver on their promises, jeopardizing patient information**

31. As it turns out, Deaton and EvoHealth never intended to provide continued maintenance and necessary upkeep of the PACS software sold to MXR's customers. Instead, they accepted MXR's money—and that of its customers—and Deaton pocketed it rather than reinvest it into his business to provide the promised services.

32. Maintaining the remote computer servers that store patient information uploaded using PACS software costs money and takes effort. It requires, among other things, internet usage costs, power bills, royalty fees, routine systems checkups, and maintenance by IT professionals.

33. Unbeknownst to MXR, EvoHealth subcontracted with a company called VoXcell Cloud, LLC (d/b/a LifeVoxel.AI or LifeVoxel) to provide administrative functions to support the server infrastructure at several sites that housed information uploaded to EvoHealth's PACS software by MXR customers. These were things EvoHealth had promised to do itself under its

7

contracts with MXR.

34. For instance, LifeVoxel had to triage EvoHealth's servers for MXR's customers to be able to access patient information.

35. Defendant Deaton stopped returning calls for services and support despite representing that EvoHealth would have "fast responses to questions and quick turnaround."

36. Defendants took MXR's customers' money and abandoned them by not paying for administrative functions to support the servers, the internet usage, and/or the associated royalty fees to keep the servers in good repair.

37. MXR paid EvoHealth millions of dollars over the course of many purchase orders for PACS software on behalf of its customers. None of that money was reinvested into EvoHealth to support the PACS systems and related services for years to come. Instead, Deaton used the money to enrich himself.

38. Deaton treated MXR's customers' money as his personal "slush fund" while having no intention of setting monies aside for the future services to be provided or to safeguard against potential corrupt servers and other risks of data loss.

39. Deaton continued to induce MXR to send its customers to EvoHealth while knowing that EvoHealth was not maintaining the software infrastructure to keep fully functional the PACS software Defendants sold to MXR's customers.

40. MXR and its customers justifiably relied on Deaton's misrepresentations that the services they paid for were going to be provided even after the last payment was made.

41. EvoHealth and Deaton began to not respond to service calls to EvoHealth from MXR's customers associated with the PACS systems, concealing their false representation that EvoHealth would provide the services bargained for.

42. Deaton deceived MXR and its customers by stating that he could provide a safe and HIPAA-compliant environment so that MXR would continue to send him new customers.

**MXR's customers experience loss in service**

43. MXR began to receive numerous, repeated complaints and inquiries from its customers due to not having access to patient information, the quality of the systems, and down servers not being maintained by EvoHealth. For instance, MXR customer CNY Family Care, LLP had documents held hostage by EvoHealth and had no choice but to purchase additional cloud storage to ensure that they would have access to their patient information for years to come.

44. Thousands upon thousands of patients were affected by Defendants' conduct, and MXR's fear that EvoHealth had failed to maintain and ultimately corrupted the servers was soon a reality when MXR customer Altoona Lung Specialists could not access the cloud infrastructure supported by LifeVoxel to view patient information.

45. On September 20, 2022, LifeVoxel sent out a global letter to MXR's customers notifying them that EvoHealth was not maintaining the servers despite repeated requests to have EvoHealth do so. The letter also attached a copy of a complaint filed by LifeVoxel against EvoHealth in the United States District Court for the District of Connecticut for breach of contract and related claims.

46. In fact, on May 27, 2022 and then on June 7, 2022, LifeVoxel alerted Defendants that a server located at an independent hosted data center in San Diego called NFINIT (the "NFINIT server") would soon become non-operational due to instability in the hardware and numerous system administration issues that had been ignored.

47. The June 7, 2022 courtesy notice listed specific action items for EvoHealth to immediately take:

9

a. "Add more servers to host more web and rendering service instances to cope with the load (additional hardware is needed)";

b. "Replace the faulty DB server and restore DB backup (additional hardware is needed, and system administration is required)";

c. "Evaluate backup storage and restore backup storage if needed (additional hardware maybe needed, and system administration is required)";

d. "Identify any additional requirements needed once evaluation of the whole system is performed (monitoring and system administration)"; and

e. "Pay for Internet so customers can access the servers."

48. The June 7, 2022 courtesy notice stated that "EvoHealth has been ignoring these servers," that LifeVoxel had "put forth couple of proposals and these [were] ignored as well," and that "[t]he servers health will ultimately lead to the whole system demise."

49. Unbeknownst to MXR, Defendants ignored these courtesy notices and took none of the remedial steps recommended by LifeVoxel. In fact, Defendants continued to accept purchase orders from MXR, putting MXR's customers and their patients' medical information in jeopardy.

50. On one occasion, Defendants' failure to maintain the servers or databases containing the information uploaded by MXR's customers resulted in a server failure that affected eight MXR customers and an annual patient volume of more than 5,000 (that is, the volume of exams performed per year based upon the customers' orders).

51. Fees to maintain the NFINIT server had not been paid by EvoHealth since December of 2022. To date, there has not been full rectification for MXR's customers on this issue.

52. In its bankruptcy proceeding (discussed below), EvoHealth blamed LifeVoxel for its own failures to service MXR customers.

53. However, LifeVoxel had previously terminated its contract with EvoHealth due to EvoHealth's continued failure to remit payment in accordance with an agreement between the two entities.

54. On or about February 22, 2023, the NFINIT server failed, resulting in multiple customers not having access to their PACS systems or prior exams of patients, effectively crippling their businesses and negatively affecting patient care.

**MXR rushes to aid its customers at its own expense to fix problems caused by Defendants**

55. Soon after, MXR received numerous calls from its customers stating that Defendant Deaton reached out to them, giving them the "run around" and claiming that the outage in service was not EvoHealth's fault and that they should not worry because it would be rectified.

56. Defendant Deaton never attempted to rectify these situations for MXR's customers.

57. Evidencing another act of deceit, Deaton eventually told MXR that EvoHealth's employees did not possess sufficient training or documentation to investigate a corrupt server, support the down server, safely manage the databases, migrate patient information, or navigate the file storage structure, all of which EvoHealth was contracted to provide.

58. Several MXR customers told MXR that they "felt bamboozled" as Defendants continued to accept final payments in the months prior to the NFINIT server's failure, leaving them out the remaining balance of the prepaid contracts for storage.

59. MXR's customers have been forced to incur additional costs and seek new vendors. In doing so, many have not used MXR to aid in these efforts due to lack of confidence in MXR, evidencing the damage caused by Defendants' conduct to MXR's reputation in the industry.

60. In many other instances, MXR has worked with other PACS software providers to facilitate some restoration of system functionality for its customers, to its own monetary detriment.

61. In addition, MXR and EvoHealth had a negotiated dealer compensation fee, as referenced on the purchase orders—that is, a fee to MXR for bringing EvoHealth customers. EvoHealth owes MXR dealer compensation fees for numerous sites amounting to approximately $100,000.00.

62. On one occasion, MXR paid EvoHealth in full before an installation of PACS software was to take place on site at MXR's customer Carolina Donor; however, EvoHealth never even started the project and absconded with $24,500.

63. Towards the end of EvoHealth's business dealings with MXR, Defendant Deaton continued to send quotes to MXR's customers for PACS software that he knew was never going to be maintained or even installed.

64. As a result of Defendants' conduct, Plaintiff has lost significant customers and business and its reputation in the medical imaging industry has been severely damaged.

**EvoHealth declares bankruptcy and then hastily dismisses the case**

65. On February 13, 2023, EvoHealth filed a voluntary bankruptcy petition under Chapter 11 in the United States Bankruptcy Court for the Eastern District of North Carolina. Plaintiff became aware of the bankruptcy on or about February 22, 2023.

66. In its bankruptcy petition, EvoHealth listed its estimated assets at between $100,001 and $500,000, further showing that Deaton was not reinvesting into his business the money Defendants received from MXR and its customers.

67. Deaton was well aware that there were no monies to disburse or invest in maintaining secured servers. Yet he continued to try and sell PACS software to MXR and its customers mere days before EvoHealth filed its bankruptcy petition.

68. On March 13, 2023, EvoHealth moved to dismiss the bankruptcy case, representing

to the bankruptcy court that it intended to dissolve under state law rather than convert the case to a Chapter 7 proceeding. On May 19, 2023, the court granted the motion and dismissed the bankruptcy case.

69. Once the case was dismissed, the automatic stay terminated and none of the debtor's debts were discharged.

## COUNT ONE
### Breach of Contract (Defendant EvoHealth)

70. MXR restates and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

71. Plaintiff and Defendant EvoHealth accepted numerous purchase orders that required EvoHealth to provide PACS software and related services to Plaintiff's customers.

72. Plaintiff compensated Defendant EvoHealth in accordance with the terms of the purchase orders.

73. Defendant EvoHealth did not provide the services as paid for in accordance with the purchase orders.

74. In addition, Plaintiff has received inquiries and complaints from its customers regarding EvoHealth's failure to provide PACS systems and related services, and Plaintiff has had to rectify these issues for its customers.

75. Defendant EvoHealth breached the contracts with Plaintiff by failing to perform under their terms.

76. Plaintiff performed its obligations under the contracts and has not breached any contractual duties that would act as a bar to its claim for Defendant EvoHealth's breaches.

77. Additionally, Defendant EvoHealth's contractual breaches have caused (and may continue to cause) customers to stop doing business with Plaintiff, which has resulted in additional

13
Case 5:23-cv-00440-BO   Document 1   Filed 08/07/23   Page 13 of 18

damages to Plaintiff in the form of lost revenue and resulting profits.

## COUNT TWO
### Breach of Contract (Defendant EvoHealth)

78. MXR restates and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

79. Defendant Deaton, on behalf of Defendant EvoHealth, accepted an invitation to serve as a paid sponsor at MXR's National Sales Meeting. EvoHealth did not pay for the sponsorship and reaped the benefits of free marketing and dedicated meeting time with the entire MXR Sales Team.

80. Plaintiff is entitled to damages as a result of EvoHealth's breach, namely, the sponsorship fee that EvoHealth promised to pay in return for attendance and participation at MXR's National Sales Meeting.

## COUNT THREE
### Unjust Enrichment (Defendant EvoHealth)

81. MXR restates and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

82. MXR conferred a direct benefit on Defendant EvoHealth under circumstances that give rise to a legal or equitable obligation on the part of the Defendants to account for such benefits, namely, by paying EvoHealth for services that were never rendered.

83. EvoHealth voluntarily accepted and retained the funds paid by MXR even though it never performed as promised.

84. Because EvoHealth failed to perform as promised, it was unjustly enriched and it would be inequitable for EvoHealth to keep the funds paid by MXR.

85. Also, as a result of EvoHealth's failure to perform as promised, MXR has been

damaged in an amount to be proven at trial. Specifically, MXR has lost customers and significant business with such customers, in addition to an unpaid sponsorship fee.

86. As such, EvoHealth should be required to disgorge the funds that it unjustly received and retained from MXR, and should be required to make MXR whole.

## COUNT FOUR
## Fraudulent Inducement (Defendant Deaton)

87. MXR restates and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

88. Defendant Deaton fraudulently induced MXR to continue working with Defendant EvoHealth and make payments even though Deaton knew at that time that Plaintiff would not be reimbursed for EvoHealth's failure to render services bargained for.

89. Deaton made such fraudulent representations knowing that Plaintiff would rely upon the fraudulent representations, which would induce Plaintiff to continue its course of dealings with EvoHealth.

90. MXR reasonably relied upon the fraudulent representations thereby causing it to continue its course of dealings without obtaining the adequate reimbursements or the promised services.

91. As a result of the reasonable reliance by MXR on Deaton's fraudulent misrepresentations, MXR has been damaged.

92. Defendant Deaton's fraudulent statements were made with malice, as, among other things, it has become clear that Deaton had no intention of performing as promised and only made his fraudulent statements to mislead MXR and coax MXR into paying EvoHealth and Deaton more money to continue to have MXR's customers contract with EvoHealth. As such, MXR is entitled to punitive damages.

15

## COUNT FIVE
### Violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C.G.S. § 75-1.1 *et seq.* (All Defendants)

93. MXR restates and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

94. Defendants entered into contracts with MXR when Defendants did not intend to keep the promises they made therein, primarily regarding their promises to maintain and service PACS software sold to MXR customers.

95. Defendants made deliberate misrepresentations to MXR during the formation of the contracts between EvoHealth and MXR, primarily regarding their capacity and inclination to continue maintaining and servicing PACS software sold to MXR customers.

96. Defendants attempted to conceal EvoHealth's breaches of the contracts between EvoHealth and MXR and deter MXR from investigating their conduct, primarily through communications from Deaton to MXR.

97. Defendants engaged in intentional deception for the purpose of continuing to reap the benefits of the contracts between EvoHealth and MXR, primarily through communications from Deaton to MXR.

98. Defendants' conduct was unfair and/or deceptive and was in or affecting commerce.

99. Defendants' conduct offends established public policy of North Carolina, is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

100. Defendants' conduct has the tendency or capacity to deceive.

101. As a result of Defendants' conduct, MXR and its business were damaged in an amount to be proven at trial.

102. Defendants willfully engaged in the acts described herein.

103. MXR is entitled to treble damages and reasonable attorney's fees pursuant to N.C.G.S. §§ 75-16 and 75-16.1.

## JURY TRIAL DEMAND

104. Plaintiff demands a trial by jury on all counts and issues so triable.

## PRAYER FOR RELIEF

Wherefore, Plaintiff MXR respectfully requests that the Court enter judgment in its favor and award:

A. Compensatory damages to the maximum extent allowable by law in an amount to be finally determined at trial, plus pre- and post-judgment interest;

B. Disgorgement of funds unjustly received by Defendants;

C. Treble damages to the maximum extent allowable by law in an amount to be determined at trial;

D. Punitive damages to the maximum extent allowable by law in an amount to be determined at trial;

E. Attorney's fees and costs in Plaintiff's favor; and

F. Such other relief in favor of Plaintiff as may be just and required under the circumstances of the case.

Filed: August 7, 2023

                                                Respectfully Submitted,

                                                MXR IMAGING, INC.

                                                By: /s/ *Benjamin S. Morrell*___

Benjamin S. Morrell (NC Bar No. 56676)
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2600
Chicago, IL 60601
Telephone: (312) 527-4000
Facsimile: (312) 527-4011
bmorrell@taftlaw.com

Paul R. Harris (special appearance pending)
TAFT STETTINIUS & HOLLISTER LLP
200 Public Square, Suite 3500
Cleveland, OH 44114
Telephone: (216) 241-2838
Facsimile: (216) 241-3707
pharris@taftlaw.com

*Counsel for Plaintiff*